# EXHIBIT A

# Supreme Court of Pennsylvania
## Court of Common Pleas
## Civil Cover Sheet

_____ **County**

| For Prothonotary Use Only: |
| --- |
| Docket No: |
| 2021·2470 |

*2021 SEP 24*
*FILED IN MERCER COUNTY*
*BRICE MILLS*
*PROTHONOTARY*

*The information collected on this form is used solely for court administration purposes. This form does not supplement or replace the filing and service of pleadings or other papers as required by law or rules of court.*

**SECTION A**

**Commencement of Action:**
- ☒ Complaint
- ☐ Writ of Summons
- ☐ Petition
- ☐ Transfer from Another Jurisdiction
- ☐ Declaration of Taking

| Lead Plaintiff's Name: EDWARD L. WOODS, M.D. | Lead Defendant's Name: SHARON REGIONAL MEDICAL CENTER |
| --- | --- |
| **Are money damages requested?** ☒ Yes ☐ No | Dollar Amount Requested: (check one) ☐ within arbitration limits ☒ outside arbitration limits |
| **Is this a *Class Action Suit*?** ☐ Yes ☒ No | **Is this an *MDJ Appeal*?** ☐ Yes ☒ No |

Name of Plaintiff/Appellant's Attorney:  Matthew A. Casey/Brian J. McCormick, Jr.

☐ **Check here if you have no attorney (are a Self-Represented [Pro Se] Litigant)**

**SECTION B**

> **Nature of the Case:** Place an "X" to the left of the **ONE** case category that most accurately describes your ***PRIMARY CASE.*** If you are making more than one type of claim, check the one that you consider most important.

**TORT** *(do not include Mass Tort)*
- ☐ Intentional
- ☐ Malicious Prosecution
- ☐ Motor Vehicle
- ☐ Nuisance
- ☐ Premises Liability
- ☐ Product Liability *(does not include mass tort)*
- ☐ Slander/Libel/ Defamation
- ☒ Other:
  Wrongful termination/
  Retaliation

**MASS TORT**
- ☐ Asbestos
- ☐ Tobacco
- ☐ Toxic Tort - DES
- ☐ Toxic Tort - Implant
- ☐ Toxic Waste
- ☐ Other:

**PROFESSIONAL LIABLITY**
- ☐ Dental
- ☐ Legal
- ☐ Medical
- ☐ Other Professional:

**CONTRACT** *(do not include Judgments)*
- ☐ Buyer Plaintiff
- ☐ Debt Collection: Credit Card
- ☐ Debt Collection: Other

- ☐ Employment Dispute: Discrimination
- ☐ Employment Dispute: Other

- ☐ Other:

**REAL PROPERTY**
- ☐ Ejectment
- ☐ Eminent Domain/Condemnation
- ☐ Ground Rent
- ☐ Landlord/Tenant Dispute
- ☐ Mortgage Foreclosure: Residential
- ☐ Mortgage Foreclosure: Commercial
- ☐ Partition
- ☐ Quiet Title
- ☐ Other:

**CIVIL APPEALS**
Administrative Agencies
- ☐ Board of Assessment
- ☐ Board of Elections
- ☐ Dept. of Transportation
- ☐ Statutory Appeal: Other

- ☐ Zoning Board
- ☐ Other:

**MISCELLANEOUS**
- ☐ Common Law/Statutory Arbitration
- ☐ Declaratory Judgment
- ☐ Mandamus
- ☐ Non-Domestic Relations Restraining Order
- ☐ Quo Warranto
- ☐ Replevin
- ☐ Other:

*Updated 1/1/2011*

# NOTICE

**Pennsylvania Rule of Civil Procedure 205.5. (Cover Sheet) provides, in part:**

**Rule 205.5.    Cover Sheet**

(a)(1)   This rule shall apply to all actions governed by the rules of civil procedure except the following:

        (i)      actions pursuant to the Protection from Abuse Act, Rules 1901 et seq.

        (ii)     actions for support, Rules 1910.1 et seq.

        (iii)    actions for custody, partial custody and visitation of minor children, Rules 1915.1 et seq.

        (iv)    actions for divorce or annulment of marriage, Rules 1920.1 et seq.

        (v)     actions in domestic relations generally, including paternity actions, Rules 1930.1 et seq.

        (vi)    voluntary mediation in custody actions, Rules 1940.1 et seq.

(2)   At the commencement of any action, the party initiating the action shall complete the cover sheet set forth in subdivision (e) and file it with the prothonotary.

(b)   The prothonotary shall not accept a filing commencing an action without a completed cover sheet.

(c)   The prothonotary shall assist a party appearing pro se in the completion of the form.

(d)   A judicial district which has implemented an electronic filing system pursuant to Rule 205.4 and has promulgated those procedures pursuant to Rule 239.9 shall be exempt from the provisions of this rule.

(e)   The Court Administrator of Pennsylvania, in conjunction with the Civil Procedural Rules Committee, shall design and publish the cover sheet.  The latest version of the form shall be published on the website of the Administrative Office of Pennsylvania Courts at www.pacourts.us.

# IN THE COURT OF COMMON PLEAS OF MERCER COUNTY, PENNSYLVANIA

| | |
|---|---|
| **EDWARD L. WOODS, M.D.,** : | **CIVIL DIVISION** |
| : | |
| **Plaintiff,** : | No. 2021-2478 |
| **v.** : | |
| : | |
| **SHARON REGIONAL MEDICAL CENTER,** : | |
| **SHARON CLINIC COMPANY, LLC,** : | **JURY TRIAL DEMANDED** |
| **STEWARD SHARON REGIONAL HEALTH** : | |
| **SYSTEM, INC. D/B/A SHARON REGIONAL** : | |
| **MEDICAL CENTER, STEWARD MEDICAL** : | |
| **GROUP, INC. and STEWARD HEALTH CARE** : | |
| **SYSTEM LLC,** : | |
| : | |
| **Defendants,** : | |

## NOTICE TO PLEAD

**NOTICE**

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW. THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER.

IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE.

Mercer County Lawyers Referral Service
c/o Mercer County Bar Association
P.O. BOX 1302
hermitage, PA 16148
Telephone: (724) 342-3111

**ADVISO**

Le han demandado a used en la corte. Si usted quiere defenderse de estas demandas expuestas en las paginas siguientes, usted tiene veinte (20) dias de plazo al partir de la fecha de la demanda y la notificacion. Hace falta asentar una comparencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que si usted no se defiende, la corte tomara medidas y puede continuar la demanda en contra suya sin previo aviso o notificacion. Ademas, la corte pueda decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda. Usted puede perder dinero o sus propiedades u otros derechos importantes para usted.

LLEVE ESTA DEMANDA A UN ABOGADO INMEDIATAMENTE, SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICIO, VAYA EN PERSONA O LLAME POR TELEFONO A LA OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL.

ESTA OFICINA LO PUEDE PROPORCIONAR CON INFORMACION ACERCA DE EMPLEAR A UN ABOGADO. SI USTED NO PUEDE PROPORCIONAR PARA EMPLEAR UN ABOGADO, ESTA OFICINA PUEDE SER CAPAZ DE PROPORCIONARLO CON INFORMACION ACERCA DE LAS AGENCIAS QUE PUEDEN OFRECER LOS SERVICOS LEGALES A PERSONAS ELEGIBLES EN UN HONORARIO REDUCIDO NINGUN HONORARIO.

Mercer County Lawyers Referral Service
c/o Mercer County Bar Association
P.O. BOX 1302
Hermitage, PA 16148
Telephone: (724) 342-3111

# IN THE COURT OF COMMON PLEAS OF MERCER COUNTY, PENNSYLVANIA

|  |  |  |
|---|---|---|
| **EDWARD L. WOODS, M.D.,** | : | |
| **Plaintiff,** | : | No. 2021-2478 |
| **v.** | : | |
| **SHARON REGIONAL MEDICAL CENTER, SHARON CLINIC COMPANY, LLC, STEWARD SHARON REGIONAL HEALTH SYSTEM, INC. D/B/A SHARON REGIONAL MEDICAL CENTER, STEWARD MEDICAL GROUP, INC. AND STEWARD HEALTH CARE SYSTEM LLC,** | : | **COMPLAINT** |
| **Defendants.** | : | **JURY TRIAL DEMANDED** |

Filed on Behalf of Plaintiff

Counsel of Record for this Party:

Matthew A. Casey, Esquire
Pa. ID No. 84443
Brian J. McCormick, Jr., Esquire
Pa. ID No. 81437

**ROSS FELLER CASEY, LLP**
One Liberty Place
1650 Market St., 34th Floor
Philadelphia, PA 19103
215-574-2000
bmccormick@rossfellercasey.com

FILED IN MERCER COUNTY
2021 SEP 24  AM 11: 23
RUTH A. BICE
PROTHONOTARY

Pd $128.25

**ROSS FELLER CASEY, LLP**
By:     MATTHEW A. CASEY, ESQUIRE (#84443)
          BRIAN J. MCCORMICK, JR., ESQUIRE (#81437)
One Liberty Place
1650 Market Street, 34th Floor
Philadelphia, Pennsylvania 19103
(215) 574-2000

*Attorneys for Plaintiff*

| | |
|---|---|
| **EDWARD L. WOODS, M.D.**<br>**4112 Wythe Ave.**<br>**Richmond, VA  23221**<br>        **Plaintiff,**<br><br>    **v.**<br><br>**SHARON REGIONAL MEDICAL CENTER**<br>**740 East State Street**<br>**Sharon, PA  16146**<br><br>**SHARON CLINIC COMPANY, LLC**<br>**740 East State Street**<br>**Sharon, PA  16146**<br><br>**STEWARD SHARON REGIONAL HEALTH**<br>**SYSTEM, INC. D/B/A SHARON REGIONAL**<br>**MEDICAL CENTER**<br>**740 East State Street**<br>**Sharon, PA  16146**<br><br>**STEWARD MEDICAL GROUP, INC.**<br>**1900 N. Pearl Street, Suite 2400**<br>**Dallas, Texas 75201**<br><br>**STEWARD HEALTH CARE SYSTEM LLC**<br>**1900 N. Pearl Street, Suite 2400**<br>**Dallas, Texas 75201**<br><br>        **Defendants.** | **MERCER COUNTY COURT**<br>**OF COMMON PLEAS**<br><br>No. __2021-2478__<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff Edward L. Woods, M.D, by and through his undersigned attorneys, Ross Feller

Casey, LLP, brings this action against his former employers, Defendants Sharon Regional

Medical Center, Sharon Clinic Company, LLC, Steward Sharon Regional Health System, Inc.

d/b/a Sharon Regional Medical Center, Steward Medical Group, Inc. and Steward Health Care

System LLC for wrongful termination in violation of Pennsylvania common law and the

Pennsylvania Whistleblower Law, 42 P.S. 1421 *et seq.*, as amended. Plaintiff demands damages

in a sum in excess of the local arbitration limits, exclusive of interest, costs, and damages for

prejudgment delay, upon the causes of action set forth below.

## I.    INTRODUCTION

1.     This is an action for an award of damages, punitive damages, attorneys' fees and

other relief on behalf of Edward L. Woods, M.D., a cardiothoracic surgeon and a former naval

aviator, who previously worked for Defendants.

2.     Dr. Woods was wrongfully terminated and retaliated against for reporting serious

safety issues and concerns relating to another cardiothoracic surgeon on staff at Sharon Regional

Medical Center ("SRMC"), as well as resisting and exposing the cover-up instituted by SRMC's

corporate parent.

3.     Plaintiff Dr. Woods brings this action for wrongful termination under

Pennsylvania common law and under the Pennsylvania Whistleblower Law, 43 P.S. § 1421 *et*

*seq.*

## II.    PARTIES

4.     Plaintiff Edward L. Woods, M.D. ("Dr. Woods" or "Plaintiff") is a resident of the

Commonwealth of Virginia. Dr. Woods worked as a cardiothoracic surgeon at Sharon Regional

Medical Center from July 2014 until September 2019, when he was terminated by Defendants.

5.     Dr. Woods, a retired Commander in the Navy, is an accomplished and well-

respected cardiothoracic surgeon. He has been practicing medicine for more than four decades

after flying jets while serving as a combat pilot for the United States Navy during the Vietnam War.

6.      Dr. Woods received his medical degree at the University of Missouri in Columbia, Missouri and was board-certified from the American Board of Thoracic Surgery.

7.      Dr. Woods has completed appointments in multiple military medical facilities, including head of the Cardiothoracic Surgery division at the Naval Hospital in Bethesda, Maryland, and Assistant Professor of Surgery at the University of the Health Sciences in Bethesda.

8.      Dr. Woods also served as a consultant in Cardiac and Thoracic Surgery at Walter Reed Army Medical Center in Washington, DC and for the National Institutes of Health in Bethesda, Maryland. Additionally, he served as a clinical associate in thoracic and cardiovascular surgery at the Cleveland Clinic Foundation in Cleveland, Ohio and staff surgeon at the Department of Cardiovascular Surgery at Geisinger Health System in Danville, Pennsylvania.

9.      Defendant Sharon Regional Medical Center ("SRMC") is a non-profit corporation organized and existing under the laws of the Commonwealth of Pennsylvania.

10.     SRMC is a 220-bed acute-care hospital located at 740 E. State Street, Sharon, Mercer County, Pennsylvania.

11.     Defendant Steward Sharon Regional Health System, Inc. d/b/a Sharon Regional Medical Center is a corporation organized and existing under the laws of the State of Delaware. At all times relevant hereto, Defendant Steward Sharon Regional Health System, Inc. owned, operated and/or or controlled SRMC.

3

12.   Defendant Steward Sharon Regional Health System, Inc. d/b/a Sharon Regional Medical Center is registered and authorized to conduct business in the Commonwealth of Pennsylvania, subjecting it to the general jurisdiction of this Court.

13.   SRMC and Defendant Steward Sharon Regional Health System, Inc. consist of the acute-care hospital and 19 satellite centers in Sharon, Hermitage, and Mercer, Pennsylvania, and Hubbard, Ohio.

14.   Defendant Sharon Clinic Company, LLC is a limited liability company organized and existing under the laws of the State of Delaware.

15.   Defendant Sharon Clinic Company, LLC is registered and authorized to conduct business in the Commonwealth of Pennsylvania, subjecting it to the general jurisdiction of this Court.

16.   Defendant Steward Medical Group, Inc. is a non-profit corporation organized and existing under the laws of the Commonwealth of Massachusetts. Defendant Steward Medical Group, Inc. has its principal place of business at 1900 North Pearl Street, Suite 2400, Dallas, Texas.

17.   Defendant Steward Medical Group, Inc. is registered and authorized to conduct business in the Commonwealth of Pennsylvania, subjecting it to the general jurisdiction of this Court.

18.   Defendant Steward Health Care System LLC is a Delaware limited liability company with its principal place of business at 1900 North Pearl Street, Suite 2400, Dallas, Texas.

19.     Defendant Steward Health Care System LLC is registered and authorized to conduct business in the Commonwealth of Pennsylvania, subjecting it to the general jurisdiction of this Court.

20.     Collectively, Steward Medical Group, Inc. and Steward Health Care LLC will be referred to as "Steward."

21.     Steward is a privately-owned, physician-led health care services organization that operates hospitals and healthcare facilities throughout the United States.  Steward claims it is the "largest physician-owned health care network" in the United States.

22.     In May 2017, Defendant Steward Health Care System LLC acquired eight hospitals in Pennsylvania, Florida and Ohio, including Sharon Regional Medical Center.  SRMC had previously been owned by Community Health Systems Inc., a for-profit business headquartered in Brentwood, Tennessee.

23.     Accordingly, since May 2017, SRMC has been operated and managed by Steward.

24.     Since May 2017, Steward has owned, operated, controlled and managed SRMC, by and through the conduct of its officers, managers agents and employees.

25.     At all times relevant hereto, Defendants received funds by and/or through the Commonwealth of Pennsylvania and/or political subdivisions authority including, but not limited to, participation in Pennsylvania's Medical Assistance program (Medicaid).

26.     Defendants receive funds by and/or through the Commonwealth of Pennsylvania and/or political subdivisions authority as a result of SRMC's status as a non-profit corporation and exemption from certain taxes, including, but not limited to, real estate tax.

5

### III.   JURISDICTION AND VENUE

27.     The causes of action which form the basis of this matter arise under Pennsylvania

common law and under the Pennsylvania Whistleblower Law, 43 P.S. § 1421 *et seq.*

28.     This court has jurisdiction over this matter because Defendants reside in Mercer

County and Defendants regularly conduct business in Mercer County.

29.     Venue is appropriate in this Court pursuant to Pa.R.Civ.P. 2179.

### IV.   FACTS

#### A. Dr. Woods is Recruited By, and Joins, Defendants to Practice at Sharon Regional Medical Center

30.     Dr. Woods started working at SRMC in July 2014 as a *locum tenens* physician.

31.     Dr. Woods had been recruited to SRMC due to his specialty as a board-certified

cardiothoracic surgeon.

32.     Dr. Woods served in a *locum tenens* role at SRMC through November 2015.

33.     Based on his outstanding performance at SRMC, Dr. Woods was offered a full-

time position at SRMC in Fall 2015 to begin in 2016.

34.     Dr. Woods began working for SRMC as a full-time cardiothoracic surgeon on or

around April 10, 2016.  Dr. Woods also had privileges to operate at Trumbull Regional Medical

Center (n/k/a Steward Trumbull Memorial Hospital, Inc.), another Steward-owned hospital in

Warren, Ohio.

35.     For the more than five years he worked for Defendants, Dr. Woods performed his

duties in a competent and professional manner.

36.     For the more than five years he worked for Defendants, Dr. Woods had a

congenial and professional working relationship with the doctors, nurses and other staff at

SRMC.

37.     For the more than five years he worked for Defendants, Dr. Woods never had one complaint or grievance raised by a patient.

38.     Guided by his *Hippocratic Oath* "to do good or to do no harm," Dr. Woods' primary concern throughout his professional career is, and had always been, patient care and safety.

## B. Defendants Hire Dr. Connor as a Cardiothoracic Surgeon at Sharon Regional Medical Center

39.     In or around May 2018, Defendants hired Ann R. Connor, M.D., as another cardiothoracic surgeon at SRMC.  Dr. Connor began work at SRMC in or around June 2018.

40.     *After* Dr. Connor executed her contract with Defendants, an employee of Defendants' Human Resources department asked Dr. Woods to contact Dr. Connor's references. Upon information and belief, no employee of Defendants checked Dr. Connor's references.

41.     Joseph Hugar, who was President of SRMC, told Dr. Woods that Dr. Connor had been "vetted" by Steward "in Boston".

42.     At some point in Fall 2018, Dr. Connor was made the Chief of Cardiothoracic Surgery at SRMC.

43.     Upon information and belief, Dr. Connor has an undistinguished history as a surgeon, including short stints at several hospitals around the country.

44.     Dr. Connor's license to practice medicine was suspended in Missouri on September 12, 2018 and Dr. Connor's license to practice medicine in Virginia was suspended on November 16, 2018.

45.     During her employment with Defendants, Dr. Connor continued to seek *locum tenens* employment in other states, including California.

7

46.     Although Defendants were aware of Dr. Connor's *locum tenens* employment, Dr. Connor asked Dr. Woods to lie to SRMC management if they asked about her whereabouts while she was working as a *locum tenens* physician in another state.

47.     Dr. Connor specifically informed Dr. Woods that she had deceived Hospital President Hugar regarding the extent of her *locum tenens* work.

48.     On at least one occasion, Dr. Connor was forced to take a late-night flight from her position with a hospital in California back to Pennsylvania to work a shift at SRMC. Upon information and belief, Dr. Connor was tired, upset and distraught when she arrived at SRMC for her shift due to travel delays and her work schedule.

49.     Dr. Connor made serious medical mistakes in her time at SRMC.  Upon information and belief, her medical mistakes contributed to the death of several patients.

50.     Dr. Connor engaged in behavior which resulted in complaints from patients, at least one of whom filed a formal complaint.

51.     Dr. Connor's serious and repeated medical mistakes put patients in jeopardy.

**C. Complaints Related to Dr. Connor's Performance Begin to Multiply**

52.     In Fall 2018, soon after she began operating at SRMC, multiple nurses at SRMC apprised Dr. Woods of Dr. Connor's poor surgical techniques and her flawed care and treatment of patients. Dr. Woods told the nurses to (1) speak directly with Dr. Connor and (2) report their concerns to their direct supervisors.

53.     Dr. Woods made Defendants' administration/management aware of these criticisms.

54.     For example, Dr. Woods received a complaint from a nurse about Dr. Connor on or about November 23, 2018.

55.     Upon information and belief, this nurse told her supervisors that she did not want to be assigned to any of Dr. Connor's cases. This nurse soon resigned after making this request to SRMC's administration.

56.     On another occasion, a perfusionist at SRMC complained to Dr. Woods about Dr. Connor's non-standard perfusion technique during a cardio-pulmonary bypass surgery.

57.     The perfusionist told Dr. Woods that he spoke to Dr. Connor and she threatened to have him fired if he ever spoke to any other surgeon about her technique.

58.     Dr. Woods made Defendants' administration/management aware of this complaint.

59.     Dr. Woods made specific reports of patient harm to the SRMC administration in November 2018, including to Hospital President Hugar on or about November 26, 2018.

60.     On or about January 4, 2019, Hospital President Hugar approached Dr. Woods after one of Dr. Connor's surgeries to inquire into her performance.  Dr. Woods repeated his observations of Dr. Connor's shortcomings with Hospital President Hugar.

61.     That same day, Dr. Woods discussed Dr. Connor's deficiencies with SRMC's Chief Medical Officer, Robert Morgenstern, M.D., who was an internal medicine physician at SRMC.

62.     Despite Dr. Woods' report on Dr. Connor's inadequate performance, Hospital President Hugar informed Dr. Woods that he would no longer discuss Dr. Connor, or discipline her, until Brian P. Priest, M.D., arrived.

63.     Dr. Priest had been hired by Defendants to serve as another cardiothoracic surgeon at SRMC and was scheduled to begin work in February 2019.  One of the first tasks

given to Dr. Priest when he began at SRMC was a directive that he operate with Dr. Connor to assess her capabilities.[1]

64.     Further, during the period of January 5-8, 2019, several SRMC employees, including a cardiologist, several nurses and one patient, complained to Dr. Woods about Dr. Connor.

65.     Dr. Woods instructed each SRMC employee to report their concerns to their supervisors.

66.     Dr. Woods also reported these concerns to CMO Dr. Robert Morgenstern, on or around January 8, 2019.

67.     Around the same time, Dr. Woods told CMO Dr. Robert Morgenstern, Roger Mitty, M.D. (Steward's Chief Physician Executive and a Senior Vice President, Central Division), Chief of Surgery Dr. Ambrosino and Hospital President Hugar that Dr. Connor had been terminated for operative problems at hospitals in Winchester, Virginia and at the University of West Virginia.

68.     Similarly, on or around February 5, 2019, a nurse spoke to Dr. Connor about her concerns related to the care of a patient Dr. Connor treated. The nurse informed Dr. Woods that Dr. Connor did not report certain medical issues of the patient to the patient's children.

69.     Dr. Woods reported this criticism to CMO Dr. Morgenstern on or around February 6, 2019.

---

[1] Similarly, in or around October 2018, Dr. Woods had been asked by John Ambrosino, M.D., a vascular surgeon at SRMC and the hospital's Chief of Surgery, to assess Dr. Connor's recent surgeries and perform a focused professional practice evaluation ("FPPE") on Dr. Connor. Dr. Woods told Dr. Ambrosino that he could not perform the FPPE as Dr. Woods considered it a conflict of interest for him to evaluate his direct supervisor. Dr. Ambrosino did not challenge Dr. Woods' decision.

70.     Dr. Woods assisted Dr. Connor with six open-heart surgeries during Dr. Connor's time at SRMC. Dr. Woods identified substandard care by Dr. Connor as follows in the six cases:

        a.      There were two deaths in the cases.

        b.      In three of the cases, the patients needed multiple operations.

        c.      In three of the cases, the patient had cardiac arrest and required open-heart massage.

        d.      In four of the cases, Dr. Woods needed to correct Dr. Connor's work related to the patient's left internal mammary artery (internal thoracic artery) and left anterior descending coronary artery graft because of technical problems in Dr. Connor's surgical procedure.

        e.      In all six of the cases, Dr. Woods was forced to offer or suggest standard procedures to assist Dr. Connor with the patient.

71.     But for Dr. Woods' exemplary treatment of these patients, these patients may have suffered grievous harm, as the care provided by Dr. Connor was poor.

72.     At some point, Dr. Connor had become hostile and antagonistic toward SRMC staff and physicians, including Dr. Woods, after she was asked to address the very serious issues.

73.     Dr. Connor became especially hostile and antagonistic toward Dr. Woods because Dr. Woods had raised concerns regarding Dr. Connor's substandard treatment of patients.

74.     For example, Dr. Connor consistently failed to return Dr. Woods' telephone calls or respond to inquiries relating to standard of care issues from Dr. Woods, as well as other SRMC employees.

75.     A board-certified cardiothoracic surgeon at SRMC told Dr. Woods that he did not believe Dr. Connor should be performing cardiac surgery due to her poor technique.  Another cardiothoracic surgeon at SRMC told Dr. Woods that Dr. Connor's technique were the worst he had ever seen.

76.     Upon information and belief, at least two other physicians at SRMC – Chief of Surgery Dr. Ambrosino and CMO Dr. Morgenstern - also believed that Dr. Connor should not be performing surgeries.

77.     Thus, numerous medical personnel at SRMC voiced their concerns about Dr. Connor's care and treatment of her patients to Dr. Woods and to Defendants.

78.     Dr. Woods repeated many of these concerns to hospital officials.

79.     Defendants did not listen to or respond to these many reports.

**D. Dr. Woods Continues to Provide Information Relating to Dr. Connor's Performance and Defendants Turn to an Independent Analysis of Dr. Connor**

80.     Although, as described above, senior SRMC administration officials had been told about and/or identified deficiencies in Dr. Connor's performance as early as September and October 2018, they chose not to act on these deficiencies.

81.     Dr. Woods made additional reports relating to Dr. Connor's performance to Senior Vice President Dr. Mitty on or about December 7, 2018.

82.     Dr. Mitty told Dr. Woods that Defendants had retained Duke University to perform an independent review of Dr. Connor's pasts surgeries and surgical procedures.

83.     Dr. Mitty disclosed to Dr. Woods that Defendants desired to terminate Dr. Connor "with cause" and Defendants believed the results from an independent examination by Duke University would provide Defendants with sufficient justification to terminate Dr. Connor.

84.     SRMC received the final report from Duke University (the "Duke Report") on or around Monday, March 11, 2019, approximately three months after the report had been commenced.

85.     However, upon information and belief, Defendants knew the results of the Duke Report in late January 2019.

12

86.     Upon information and belief, SRMC's administration met on Wednesday, March 13, 2019 and decided to terminate Dr. Connor based on the findings in the Duke Report.

87.     Dr. Mitty and CMO Dr. Morgenstern informed Dr. Woods that Dr. Connor would be terminated in the morning on Monday, March 18, 2019.

88.     However, Defendants still (1) permitted Dr. Connor to perform surgeries on Thursday, March 14, 2019, and (2) allowed Dr. Connor to take calls at Trumbull over the weekend of March 15-16, 2019, *despite the findings in the Duke Report*.

89.     Dr. Connor was terminated on Monday, March 18, 2019, after a particularly horrifying and disastrous surgical procedure performed on March 14, 2019 became public.

90.     Dr. Mitty, on behalf of SRMC and Steward, announced Dr. Connor's exit after the close of business on March 18, 2019.

91.     Upon information and belief, Defendants never revoked Dr. Connor's privileges at SRMC.

E.  **Dr. Woods Provides Additional Information to Defendants and, in Response, Defendants Start to Retaliate Against Dr. Woods**

92.     On March 26, 2019, Dr. Woods sent a detailed email to Dr. Mitty discussing Dr. Connor's tragic surgery on March 14, 2019.  In the email, Dr. Woods makes reference to the death of patient who had been operated on by Dr. Connor in November 2018 while she was working as a *locum tenens* doctor.

93.     In his email, Dr. Woods reminded Dr. Mitty that the Duke Report "state[d] there are major problems with her technique."

94.     Dr. Woods warned Dr. Mitty of the impending "public relations nightmare" and that Steward should not avoid its "responsibility to the patients, Community or staff."  Dr.

Woods told Dr. Mitty there would be a "class action" if patients ever found out about Dr. Connor's flawed and shoddy skills.

95.     Yet, this is precisely what Defendants did!

96.     Dr. Woods followed that email with a separate email to Hospital President Hugar on April 3, 2019. In his email, Dr. Woods noted that

> You [Hospital President Hugar] told me in January 2019 you were concerned about any written information concerning dr. Connor which would be discoverable and therefore should be avoided. Since you were unavailable you leave me no choice but to put my concerns in writing.

97.     In this email, Dr. Woods also suggested that Defendants report Dr. Connor to the National Practitioner Data Bank ("NPBD"). The NPBD was created by federal law and requires the reporting of medical malpractice payments and certain adverse actions related to healthcare practitioners.

98.     Dr. Woods forwarded this email to Chief of Surgery Dr. Ambrosino on April 4, 2019, and stated – "This surgeon needs to be reported to the NPBD. This is a letter I sent Mr Hugar with a copy to Dr Mitty."

99.     Dr. Woods forwarded this email to CMO Dr. Morgenstern on April 5, 2019, and stated – "I sent this to Joe [Hugar]. Did not want you blindsided. Also sent it to John [Ambrosino] and Roger [Mitty]. I will loose [sic] my position over this most likely."

100.    On June 17, 2019, Dr. Woods discussed Dr. Connor's performance and substandard care with Debra Summers, Director Risk Management, Clinical Operations for Steward.

101.    Dr. Woods had been instructed to speak with Ms. Summers by Dr. Mitty.

102.    Dr. Woods subsequently sent Steward officials more than 100 pages of documentation relating to Dr. Connor and the issues Dr. Woods observed at SRMC.

14

103.   Dr. Woods told Dr. Mitty that after his discussion with Ms. Summers, Dr. Woods felt that the "administrative misconduct which led to the patient harm would be addressed."

104.   Following his call with Ms. Summers and sending her hundreds of pages of material, Dr. Woods was verbally attacked and criticized by CMO Dr. Morgenstern on June 17 and 18, 2019.

105.   CMO Dr. Morgenstern threatened Dr. Woods with legal action. This threat would soon prove to be true.

106.   On June 28, 2019, Dr. Woods suggested, in an email, that Defendants perform a "Root Cause Analysis" related to "the events of the past 15 months which caused patients harm." This email was directed to Hospital President Hugar, CMO Dr. Morgenstern, Dr. Priest, Dr. Ambrosino and Dr. Mitty.

107.   On or around July 1, 2019, Dr. Woods informed Ms. Summer that he was the victim of a "hostile work place" and was suffering "retaliation."

108.   On July 15, 2019, Dr. Woods sent a detailed report to Michael Callum, M.D., Steward's Executive Vice President for Physician Services.

109.   Dr. Woods requested that Dr. Callum forward the report to Ralph de la Torre, M.D., founder, Chairman and CEO of Steward.

110.   Dr. Woods detailed the "deaths and patient harm" inflicted by Dr. Connor and Defendants' refusal to address her deficiencies. Further, Dr. Woods discussed the "red flags" in Dr. Connor's job history.

111.   Specifically, Dr. Woods wrote that "deaths of her patient(s) started occurring soon after her arrival. The administrator ignored all warnings."

112.    On July 18, 2019, Dr. Woods wrote and mailed a hand-written note to CEO Dr.

de la Torre relating to Dr. Connor and the retaliation that Dr. Woods was now facing for

reporting Dr. Connor.

113.    Dr. Woods wrote, in part:

> Isn't it ironic that I have done nothing wrong and yet I am the one who is
> afraid. Afraid of the full retaliation of the corporation which I have tried to
> protect. All for persisting in bring[ing] forward surgical and administrative
> misconduct which led directly to preventable death and patient harm.

114.    Dr. Woods noted that "patient harm continued unabated" during the three months

that Defendants awaited the Duke Report.

115.    At or around the same time (July 2019), Dr. Woods discussed the above-described

issues with Gail Kroen, who, at the time, was the Vice President, Central Region for Steward.

(Ms. Kroen is now the Vice President, Human Resources, for Steward.)

116.    During the course of his meeting with Ms. Kroen, Dr. Woods showed her a copy

of a New York Times article reporting on North Carolina Children's Hospital. *See* May 31,

2019, Ellen Gabler, *Doctors Were Alarmed: 'Would I Have My Children Have Surgery There?'*,

The New York Times, available at https://www.nytimes.com/interactive/2019/05/30/us/children-

heart-surgery-cardiac.html.

117.    Dr. Woods compared Steward's conduct to the issues at North Carolina

Children's Hospital. Ms. Kroen agreed.

118.    In August 2019, Dr. Woods was contacted by Defendants' lawyers to discuss

issues relating to Dr. Connor.

119.    Over the course of three months in 2019, Dr. Woods sent extensive materials

relating to Dr. Connor and SRMC's cover-up to various individuals representing Defendants on

at least three occasions:

16

      a.   To Debra Summers in June 2019;

      b.   To Steward Corporate Compliance in July 2019;

      c.   To Gail Kroen in July 2019.

120.    When *SRMC's* administration and management failed to take appropriate steps to correct the serious quality of care issues Dr. Woods brought to their attention, as detailed above, Dr. Woods made reports to the appropriate management at *Steward* headquarters.

121.    Thus, Dr. Woods brought Dr. Connor's performance to the attention of Defendants' administration and management, including, but not limited to, CEO Dr. de la Torre, Executive Vice President Callum, Hospital President Hugar, CMO Dr. Morgenstern, Chief of Surgery Dr. Ambrosino and Senior Vice President Dr. Mitty.

122.    Administration and management at SRMC and Steward have admitted Dr. Woods reported concerns regarding Dr. Connor.

123.    Upon information and belief, Defendants never reported Dr. Connor to the NPBD.

124.    Dr. Woods made truthful and professional reports of the negligent and/or professional misconduct of Dr. Connor.

125.    Defendants took no meaningful steps to address Dr. Woods' concerns or Dr. Connor's performance.

126.    Dr. Woods detailed 23 serious, potentially fatal, adverse outcomes of patients treated by Dr. Connor.

127.    Despite Dr. Woods' numerous warnings and alerts, Defendants were negligent in their approach to Dr. Connor's practice in the following ways, among others:

      a.   Failing to investigate Dr. Connor's background and experience before granting her privileges to perform cardiothoracic surgeries on Pennsylvania residents;

b. Failing to properly monitor and/or supervise Dr. Connor after they granted her privileges to perform cardiothoracic surgeries;

c. Failing to respond to Dr. Connor's pattern of intraoperative complications and poor surgical outcomes and to take action to prevent her from causing harm to patients;

d. Failing to investigate Dr. Connor's odd behavior, lack of appropriate demeanor and extreme lack of organization;

e. Failing to exercise appropriate supervision over Dr. Connor; and

f. Allowing Dr. Connor to operate on SRMC patients (Pennsylvania residents) after having received specific warnings about her lack of competence and ability.

128.    Thus, Defendants were aware of and effectively condoned significant lapses in quality of patient care which endangered patients and resulted in at least four deaths.

129.    Dr. Woods provided shocking data and details to Defendants' administration and management, confirmed by his own contemporaneous notes and the contemporaneous medical records of the patients to Defendants' management both before and after Dr. Connor's termination.

130.    Defendants' administration and management became hostile and antagonistic toward Dr. Woods because Dr. Woods had made truthful and professional reports regarding the negligence and surgical misconduct of Dr. Connor.

131.    For example, CMO Dr. Morgenstern instructed the manager of the ICU unit at SRMC to immediately inform him or Dr. Priest if Dr. Woods attempted to discharge a patient or failed to schedule a patient for surgery.

132.    This type of supervision and oversight was unnecessary, belittling and demeaning to Dr. Woods.

133.    Similarly, Hospital President Hugar refused to speak to Dr. Woods after February 7, 2019, when Dr. Woods raised issues of patient care with him.

134.    Defendants unfairly, and in retaliation for his honest reporting, terminated Dr. Woods' employment.

135.    As a direct and proximate result of the Defendants' conduct described herein, Dr. Woods has suffered significant financial losses, including lost wages.

136.    As a direct and proximate result of the Defendants' conduct described herein, Dr. Woods has incurred a significant obligation for attorneys' fees and costs of bringing this action.

137.    As a direct and proximate result of the Defendants' conduct described herein, Dr. Woods has suffered and continues to suffer significant emotional distress.  For example, Dr. Woods decided to remain at SRMC to protect the patients, despite his severe misgivings about Dr. Connor and the Defendants' cover-up.

138.    Defendants and their agents acted with knowledge of, or in reckless disregard of the probability that their actions and inactions would cause Dr. Woods to suffer emotional distress.

139.    Defendants' actions were intentional and willful and warrant the imposition of punitive damages.

## V.    CLAIMS

### Count 1
### Unlawful Retaliation for Whistleblowing in Violation of
### Public Policy in the Commonwealth of Pennsylvania

140.    Plaintiff Dr. Woods incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

141.    Defendants harassed, threatened, discharged, and otherwise discriminated against Relator in the terms and conditions of his employment because he reported what he believed in good faith to be violations of the public policy in the Commonwealth of Pennsylvania.

19

142.    The actions of Defendants, through their agents, servants and employees, including, but not limited to, their termination of Dr. Woods' employment in retaliation for his reporting Defendants' misconduct, constitute a violation of well-established public policy of the Commonwealth of Pennsylvania.

143.    Defendants terminated Dr. Woods for reporting, among other things, the serious, potentially fatal, adverse actions of Dr. Connor, a cardiothoracic surgeon employed by Defendants, and the Defendants' cover-up of these actions.

144.    Moreover, Dr. Woods threatened disclosure of his findings beyond Defendants' administration and management led to retaliation, including his termination.

145.    Defendants' conduct, as set forth herein, was outrageous and extreme under the circumstances and warrants the imposition of punitive damages against Defendants.

146.    As a direct and proximate result of Defendants' wrongful conduct, including, but not limited to, the termination of Plaintiff's employment, Plaintiff has suffered damages and losses.

**WHEREFORE**, Plaintiff Edward L. Woods, M.D., seeks damages in excess of $1,000,000 and respectfully requests that this Court enter judgment in his favor and against Defendants, and award appropriate legal and equitable relief; compensatory damages to make Plaintiff whole for past and future lost earning, benefits and earning capacity; compensatory damages to Plaintiff for past and future emotional upset, mental anguish, humiliation, loss of life's pleasures and pain and suffering; punitive damages; reasonable attorney's fees and costs; and grant such other and further relief as this Court deems appropriate.

## Count 2 – Retaliation in Violation of Pennsylvania Whistleblower Act

147.   Plaintiff Dr. Woods incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

148.   Defendants are employers within the meaning of the Pennsylvania Whistleblowers Act, 43 P.S. §1421 *et seq.*

149.   Defendants retaliated against Plaintiff Dr. Woods because he, in good faith and being of a high moral fiber, reported wrongdoing and substandard care being offered at SRMC.

150.   Defendants retaliated against Plaintiff Dr. Woods because he, in good faith and being of a high moral fiber, engaged in protected activity under the Pennsylvania Whistleblower Act.

151.   Defendants terminated Plaintiff Dr. Woods because he, in good faith and being of a high moral fiber, engaged in protected activity under the Pennsylvania Whistleblower Act.

152.   Defendants were aware that Plaintiff Dr. Woods engaged in protected activity under the Pennsylvania Whistleblower Act, as amended, by and without limitations, for making a report and/or being about to report Defendants' wrongdoing.

153.   The actions of Defendants, by and through their agents, servants and employees, constitute a violation of the Pennsylvania Whistleblower Act.

154.   Defendants' termination of Dr. Woods' employment violated the Pennsylvania Whistleblowers Act.

155.   Defendants terminated Dr. Woods for reporting Dr. Connor's performance.

156.   Dr. Woods' actions constitute a report of wrongdoing.

21

157.   As a direct and proximate result of Defendants' wrongful conduct and violations of the Pennsylvania Whistleblowers Act, Dr. Woods has suffered damages and losses, including, but not limited to, lost wages, lost benefits and other actual damages.

**WHEREFORE,** Plaintiff Edward L. Woods, M.D., seeks damages in excess of $1,000,000 and respectfully requests that this Court enter judgment in his favor and against Defendants, and award appropriate legal and equitable relief; compensatory damages to make Plaintiff whole for past and future lost earning, benefits and earning capacity, including front pay in lieu of reinstatement; compensatory damages to Plaintiff for past and future emotional upset, mental anguish, humiliation, loss of life's pleasures and pain and suffering; reasonable attorney's fees and costs; other such damages as are appropriate under the Pennsylvania Whistleblower Law, 43 P.S. § 1421 *et seq.*, as amended; and grant such other and further relief as this Court deems appropriate.

### Count 3 - Intentional Infliction of Emotional Distress

158.   Plaintiff Dr. Woods incorporates by reference all paragraphs of this Complaint as if fully set forth herein

159.   The actions of Defendants, as set forth herein, were outrageous and extreme.

160.   Defendants acted intentionally or recklessly and their actions caused Plaintiff severe emotional distress.

161.   The actions of Defendants constituted the tort of intentional infliction of emotional distress under the laws of the Commonwealth of Pennsylvania.

162.   Defendants are liable for these actions.

163.   Defendants' conduct, as set forth herein, was outrageous and extreme under the circumstances and warrants the imposition of punitive damages against Defendants.

164.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiff has suffered damages and losses

**WHEREFORE**, Plaintiff Edward L. Woods, M.D., seeks damages in excess of $1,000,000 and respectfully requests that this Court enter judgment in his favor and against Defendants, and award appropriate legal and equitable relief; compensatory damages to make Plaintiff whole for past and future lost earning, benefits and earning capacity, including front pay in lieu of reinstatement; compensatory damages to Plaintiff for past and future emotional upset, mental anguish, humiliation, loss of life's pleasures and pain and suffering; reasonable attorney's fees and costs; and grant such other and further relief as this Court deems appropriate.

### JURY TRIAL DEMAND

Plaintiff demands a jury trial for all claims and issues so triable.

Respectfully submitted,

Dated:  September 23, 2021

_____

Matthew A. Casey, Esquire
Brian J. McCormick, Jr., Esquire
ROSS FELLER CASEY, LLP
One Liberty Place
1650 Market St., 34th Floor
Philadelphia, PA 19103
215-574-2000
bmccormick@rossfellercasey.com

Attorney for Plaintiff

## **VERIFICATION**

I, **EDWARD L. WOODS, M.D.**, hereby verify that the within Civil Action Complaint is based on first-hand information and on information furnished to my counsel and obtained by counsel in the course of investigating the underlying facts of, and in bringing this lawsuit. The language of the document is that of counsel and not mine. I am not a lawyer, nor do I have any legal training. To the extent that the contents of the document are based on information furnished to counsel and obtained by counsel during the course counsels' investigation of the facts giving rise to this lawsuit, I have relied in good faith upon counsel in signing this verification. All statements are founded upon reasonable belief, and upon my belief that the statements contained in this Civil Action Complaint are true and correct. This verification is made subject to the penalties of 18 Pa.C.S. § 4904 relating to unsworn falsification to authorities.


EDWARD L. WOODS, M.D.

Date: 23 September 2021